FRUENDLY AUTO SOURCE,
INC., Plaintiff,

v.

Walter CHROSTOWSKI,
et al., Appellants,

v.

Certain Underwriters at Lloyd's,
London, Respondent.

No. ED 104603

Missouri Court of Appeals,
Eastern District,
DIVISION TWO.

Filed: March 28, 2017

Mark L. Williams, Lance M. McClamroch, Kirksville, MO, for Appellants.

Kevin L. Fritz, Carolyn M. Kopsy, St. Louis, MO, for Respondent.

## OPINION

Colleen Dolan, Judge

### I. Introduction

Walter Chrostowski and WJC Trucking, LLC ("Appellants") appeal the motion court's grant of Certain Underwriters at Lloyd's of London's ("Respondent") motion for summary judgment finding there was no coverage under the Liability Policy (the "Policy") issued to Appellants by Respondent.[1] Appellants argue the motion court erred by finding the written long term lease agreement between Appellants and a motor carrier, USXL Worldwide ("USXL"), was not in effect at the time of Mr. Chrostowski's accident because it had been mutually terminated by the actions of Mr. Chrostowski and USXL. We affirm.

### II. Factual and Procedural Background

On September 16, 2011, while driving his semi-truck home without an attached trailer, Mr. Chrostowski crashed into a used car dealership owned by Fruendly Auto Source, Inc. ("Plaintiff") causing damage to fourteen used cars of Plaintiff.[2] Plaintiff filed a petition against Appellants for damages. Mr. Chrostowski submitted an insurance claim to Respondent, which was denied for failure to meet a condition for coverage. The policy in question was referred to by the parties as a "Bobtail" liability policy (the "Policy").[3] This Policy states that Respondent is not responsible for providing coverage under the Policy unless Mr. Chrostowski is "operating under a presently effective, written long term lease with a motor carrier providing primary liability coverage." The Policy goes on to state that "[i]f no written long term lease exists and is effective, no coverage applies."

On March 1, 2010, Appellants entered into a written "Model Lease Agreement" (the "Lease Agreement") with USXL which provided that WJC Trucking would haul freight for USXL in return for compensation. The Lease Agreement further stated USXL would provide "all required insurance covering personal injury and property damage, and cargo loss and damage, as is required of a motor carrier engaged in interstate commerce by federal law[.]" Upon signing the Lease Agreement, USXL gave Mr. Chrostowski equipment including a qualcomm for on-the-road communication with dispatch concerning

1. Appellants also appeal the motion court's denial of their motion for summary judgment but this is not a final, appealable judgment and is only reviewable to the extent its merits are intertwined with the motion court's grant of Respondent's motion. *See Penn–Am. Ins. Co. v. The Bar, Inc.*, 201 S.W.3d 91, 96 (Mo. App. W.D. 2006) (holding the "denial of a summary judgment motion does not constitute a final judgment, is not appealable, and will only be reviewed when its merits are completely intertwined with a grant of summary judgment in favor of an opposing party"). We review the motion court's denial of the Appellant's motion for summary judgment to the extent it is so intertwined with the grant of Respondent's motion for summary judgment.

2. Walter Chrostowski is the sole member of WJC Trucking, LLC, which was the owner of a 2000 Peterbilt semi-truck.

3. According to Mr. Chrostowski, "bobtailing" is when a driver of a tractor-trailer truck drives the semi-truck without an attached trailer.

load assignments, a load lock for safely securing loads, state and federal permits, license plates, a cab-card showing he had auto liability insurance, and a pre-pass/EZ Pass Device.

The Lease Agreement provided that upon lease cancellation, the equipment provided by USXL had to be returned. Prior to September 16, 2011, Mr. Chrostowski informed USXL that he would be leaving and terminating the Lease Agreement. In anticipation of this event, Mr. Chrostowski and USXL arranged for him to bring his truck in and for USXL mechanics to remove the qualcomm device. On September 16, 2011, Mr. Chrostowski drove to the USXL truck yard located in St. Charles, Missouri, so that his qualcomm could be removed from his semi-truck. While it was being removed, Mr. Chrostowski said goodbye to the USXL employees and told USXL he was quitting. Following this device's removal, Mr. Chrostowski delivered his final load for USXL to Illinois. On his return trip to his home in Excello, Missouri, Mr. Chrostowski again stopped at the USXL yard in St. Charles and dropped off the trailer, final paperwork, and the remaining equipment in his possession belonging to USXL (license plates, permits, and cab cards) at approximately 9:00 p.m. When Mr. Chrostowski left the USXL yard he was driving his semi-truck without an attached trailer, or "bobtailing." It was on his way home that Mr. Chrostowski had the accident. After taking a drink of coffee, he began choking and blacked out, leaving the road and crashing into the Plaintiff's used car lot at approximately 10:20 p.m.

Subsequently, Mr. Chrostowski called Commercial Truck Claims Management ("CTCM"), which was designated under the Policy to act as an adjuster in the event of an accident, to make a claim on his Policy. In that phone call, Mr. Chros-towski stated he had delivered his load for the evening and when he returned to the USXL yard he "broke [his] lease at about 8:45 at night." In a second recorded phone call with CTCM, Mr. Chrostowski denied that he was taking a weekend or a week off stating, "No, actually I was done. I was coming home. My truck was going in the shop to get it paint[ed] on Monday... and I was going to go lease one with another company." In a sworn statement, given on June 28, 2012, Mr. Chrostowski stated that "I just was going to lease a truck out of somewhere else, and I came in at night and pulled my plates. And on the night of the 16th, [I] pulled my plates and put my plates and my permit both and the rest of their paperwork in a mailbox."

Aaron Ormsby, USXL's designated representative, testified that contracts between USXL and truck-drivers are more commonly terminated without written notice. He stated when there is no written notice, USXL and the contractor believe a contract is terminated when a contractor returns all of their equipment. This is because a truck driver is no longer authorized to haul a load for USXL anywhere without their license plates. He testified: "It's illegal to drive without those things and be leased to anybody... once we have all those things, they're not legally able to drive for us. And if they're not legally able to drive, then we don't have a lease with them." Mr. Ormsby further stated that USXL considered the lease with Appellants to be terminated at approximately 9:00 p.m., on September 16, 2011, when Mr. Chrostowski turned in USXL's plates and cab card.

Respondent denied the claim on September 23, 2011, for failure to meet a condition for coverage—namely because Mr. Chrostowski was not operating under a presently effective "long term lease with a motor carrier providing primary liability cover-

age" at the time of his accident. Plaintiff filed its petition against Appellants on December 7, 2012, and Appellants filed a third-party petition against Respondent on May 10, 2013, to determine whether there was coverage for the accident under the Policy. Upon Respondent's motion, this third-party petition was severed from Plaintiff's claim against Appellants. Appellants and Respondent then filed cross-motions for summary judgment to determine coverage. On July 16, 2015, the motion court denied Appellants' motion for summary judgment and granted Respondent's, finding the lease was not effective between Appellants and USXL at the time of the accident because the parties' conduct made it impossible for Appellants to legally drive for USXL. In its judgment, the motion court found that "while it may be argued that the lease exists because it was not terminated in writing, it cannot be argued that it was effective because by their mutual actions the parties made it impossible for [Mr. Chrostowski] to legally drive for USXL."

Appellants appealed the motion court's decision to this Court on August 19, 2015, and we dismissed finding that we did not have jurisdiction because there was no final, appealable judgment. On June 17, 2016, the court determined that the summary judgment only applied to the third-party claim and there was no just reason for delay in granting that order and judgment in accordance with Rule 74.01(b).[4] Appellants filed a second notice of appeal on July 19, 2016, which was also denied because this Court questioned whether certification was proper, since the claim for insurance coverage would be moot if Plaintiff lost its claim against Appellants. On December 16, 2016, Plaintiff obtained a judgment in its favor against Appellants. This appeal follows.

## III. Standard of Review

■ A trial court's decision to grant summary judgment is an issue of law, which this Court reviews de novo; we will affirm such a decision if it is proper under any legal theory supported by the record. *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010). Summary judgment is proper when a movant demonstrates the right to judgment based on material facts for which there is no genuine dispute. *Brentwood Glass Co. v. Pal's Glass Serv.*, 499 S.W.3d 296, 300 (Mo. banc 2016); *see also* Rule 74.04(c)(6). Appellate courts view evidence in the record "in the light most favorable to the party against whom judgment was entered" affording them all reasonable inferences. *Brentwood*, 499 S.W.3d at 300. As insureds, it is Appellants' burden to show that the loss and damages were covered under the Policy. *Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 80 (Mo. App. W.D. 2005).

## IV. Discussion

### a. The motion court did not err in granting Respondent's motion for summary judgment.

#### i. The Policy required Appellants to maintain a presently effective, written long term lease with a motor carrier as a condition for coverage.

■ "Interpretation of an insurance policy and the determination of whether provisions are ambiguous are questions of law, subject to de novo review." *Taylor v. Bar Plan Mut. Ins. Co.*, 457 S.W.3d 340, 344 (Mo. banc 2015). "When insurance contracts are unambiguous, they will be enforced as written absent a public policy to the contrary." *Steele v. Shelter Mut. Ins.*

4. All references are to Missouri Supreme Court Rules 2016.

*Co.*, 400 S.W.3d 295, 298 (Mo. banc 2013).[5] Language in an insurance policy is ambiguous when it "is reasonably open to different constructions." *Jones v. Mid–Century Ins. Co.*, 287 S.W.3d 687, 690 (Mo. banc 2009). In the present case, the Policy states under **"Section III. Conditions for Coverage"** that Respondents are not responsible for providing coverage under the Policy unless Mr. Chrostowski is "operating under a presently effective, written long term lease with a motor carrier providing primary liability coverage." The Policy goes on to state: "If no written long term lease exists and is effective, no coverage applies." This language unambiguously requires that the Appellants maintain a presently effective written lease with a motor carrier in order to have insurance coverage. The dispute in this case centers on whether the lease was "presently effective" at the time of the accident.

**ii. The Lease Agreement was not presently effective because it was mutually terminated by the parties prior to the accident.**

Appellants argue that the terms of the Lease Agreement provided for effectiveness until one of the parties provides written notice of termination to the other party. The Lease Agreement states:

This lease shall be effective as of the date and time the agreement is executed by both parties and shall continue in effect until terminated in accordance with the provisions of this agreement. It is contemplated that the term of this agreement will be for not less than for-ty-five (45) days from the date of execution *and will automatically continue in effect until such time as terminated mutually, or by either party, as provided in this agreement.* Should contractor or Carrier breach any of the terms of this agreement, the other party will give written notice of that breach and, if not corrected within seven (7) days of the date such notice is provided, can terminate the agreement upon twenty-four (24) hours written notice to the other party. If either party desires to terminate the agreement without cause, ten (10) days' written notice must be provided to the other party.

(emphasis added).

▮▮▮▮ Respondent urges us to interpret this clause as allowing Appellants and USXL to mutually terminate their agreement without written notice. For reasons stated below, we agree that the Lease Agreement permits mutual termination without written notice and affirm on those grounds.[6] When a court interprets a contract "[t]he terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning... A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003), *see also Lehmann v. Bank of Am., N.A.*, 427 S.W.3d 315, 320 (Mo. App. E.D. 2014).

---

5. Appellants do not assert on appeal that the Policy's conditions for coverage violate a public policy of this State.

6. The motion court granted summary judgment on the grounds that the Lease Agreement was not "presently effective" as required under the Policy. The court held it was impossible for the agreement to be performed because the return of USXL's equipment made it illegal for Mr. Chrostowski to drive for USXL. Consequently, the court did not reach the grounds upon which we affirm. However, as previously stated, we will affirm the motion court's decision to grant summary judgment if it is proper under any legal theory supported by the record. *Burns*, 303 S.W.3d at 509.

Here, the Lease Agreement states it "will automatically continue in effect until such time as terminated mutually, *or* by either party, as provided in this agreement." (emphasis added). This language is followed by two sentences outlining when and how either party may *unilaterally* terminate the contract by written notice, but the paragraph is *silent* on mutual termination and does not state mutual termination requires written notice. In interpreting a contract we are forbidden from inserting language or provisions by judicial interpretation. *The Renco Grp., Inc. v. Certain Underwriters at Lloyd's, London,* 362 S.W.3d 472, 479 (Mo. App. E.D. 2012).

■ We find that the language of this section clearly and unambiguously provides that the Lease Agreement is effective until terminated. Because the Lease Agreement states it is effective until terminated mutually, *or* by either party, we find the parties intended to distinguish these two terms. It is clear that the requirement for written notice was expressly limited to unilateral termination and is not a stated requirement for mutual termination. Under the terms of the Lease Agreement written notice is required in the event a party breaches the contract or if a single party desires to terminate the agreement without cause. Termination without cause requiring ten days' written notice obligates *one* of the parties to act unilaterally by providing notice to the *other party,* and the lease shall be terminated ten days after the other party receives written notice regardless of their actions, inaction, or desire to terminate the lease. Therefore, mutual termination does not require written notice under the terms of the lease.

■ The evidence that Mr. Chrostowski and USXL mutually terminated the Lease Agreement is as follows: First, the Lease Agreement provided that upon lease cancellation, the equipment provided by USXL had to be returned to USXL and Mr. Chrostowski made arrangements with USXL to return the equipment. Second, USXL's designated representative, Mr. Ormsby, testified that USXL considers a lease agreement terminated when a contractor returns their equipment because the contractor may no longer legally deliver loads for USXL. Third, Mr. Ormsby testified that it is more common for USXL and their contractors to terminate their lease agreements using this method than by written notice from one of the parties. Fourth, Mr. Ormsby testified USXL considered the Lease Agreement terminated on September 16, 2011, at 9:00 p.m. when Mr. Chrostowski returned USXL's equipment at the St. Charles truck yard and USXL accepted his resignation without contest. Finally, Mr. Chrostowski told the claims adjuster and gave a sworn statement that he "broke" his lease with USXL the evening of his accident at approximately 8:45 p.m. Based on the foregoing, we find that Mr. Chrostowski and USXL mutually terminated the Lease Agreement on September 16, 2011, when Mr. Chrostowski committed the final obligation left under the Lease Agreement by turning in the remaining USXL equipment in his possession after expressing his intent to terminate the lease.

Due to the fact that Appellants and USXL mutually terminated the Lease Agreement at approximately 9:00 p.m. on September 16, 2011, it was not presently effective at the time of the accident at approximately 10:20 p.m. that night. Because the Policy with Respondent required a written long term lease with a motor carrier such as USXL that "exists and is effective" as a condition for coverage, we find there was no coverage under the Policy.

## V. Conclusion

For the foregoing reasons, the judgment of the motion court is affirmed.

Sherri B. Sullivan, P.J., concurs.

Roy L. Richter, J., concurs.